IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DARLA KRAMER,

                Plaintiff,

      v.

HOMEWARD BOUND, INC.,

                Defendant.

OPINION AND ORDER

14-cv-15-slc

---

In this civil lawsuit brought pursuant to the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, as amended by the Americans with Disabilities Act Amendments of 2008 ("ADAAA"), plaintiff Darla Kramer contends that her employer, defendant Homeward Bound, Inc., violated the Act by failing to reasonably accommodate her epilepsy and then firing her from her position as a staff supervisor because of that disability.[1]  Homeward Bound denies this, contending that it offered Kramer reasonable accommodations that would have allowed her to perform the essential functions of her position and that it fired Kramer only because she refused to perform those functions.

Before the court is Homeward Bound's motion for summary judgment.  Dkt. 25.  I am granting this motion.  The evidence shows that Kramer has based this lawsuit on her own understanding of what her medical limitations ought to be, which are different from those communicated by her doctor to Homeward Bound.  As for the medical limitations actually endorsed by Kramer's physician, the undisputed evidence shows that Homeward Bound reasonably accommodated those restrictions by restructuring Kramer's job responsibilities, and

---

[1] Kramer also asserted a claim for retaliation, but  has failed on summary judgment to advance any arguments in support of it.  Accordingly, the claim is waived.  *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument ... results in waiver.").

that it terminated Kramer only after she refused to perform essential functions of her restructured job.  Accordingly, Kramer is not entitled to relief and her case must be dismissed.

For the purpose of deciding Homeward Bound's motion for summary judgment, I find the facts set out below to be material and undisputed:[2]

## UNDISPUTED FACTS

Defendant Homeward Bound, Inc. is located in Lancaster, Wisconsin.  It has two other offices, one in Prairie du Chien, the other in Baraboo.  Homeward Bound is a "Supportive Home Care and Home Health Agency" that operates in Crawford, Grant, Iowa, Richland, Sauk, Lafayette, Juneau, Colombia, Adams and Vernon Counties.  Homeward Bound provides care to its customers 24 hours a day, seven days a week.

At all times relevant to this suit, Homeward Bound was managed by Rita Schmitz, (the owner) and Pat Balk (the Service Coordinator).  Schmitz was responsible for the company's overall performance while Balk managed the office, supervised the staff supervisors and support staff, provided liaison support with contractual agencies, and developed and maintained the service delivery system.  At the time of Kramer's employment, there were 12 administrative staff employees, including Kramer.

---

[2] Homeward Bound has objected to many of Kramer's proposed facts on the ground that the supporting deposition testimony has not been authenticated properly.  Although Kramer will have to authenticate the depositions at trial, there is no reason to believe that she will not be able to do so.  *See* Fed. R. Civ. P. 56(c)(1)(B) (party challenging factual position must show that adverse party cannot produce admissible evidence to support of the fact); 56(c)(2) (party may object that material cited cannot be presented in an admissible form).  Accordingly, I have considered those proposed facts in spite of Homeward Bound's objections.  As it turns out, most of them are either undisputed or immaterial.

In late 2010, Kramer interviewed with Balk for a position as a staff supervisor at Homeward Bound's Prairie du Chien office. The company's written job description for the staff supervisor position listed the duties of a staff supervisor to include hiring and supervising care providers, making contact with clients upon admission and following up on referrals, and being responsible for intake and monthly work schedules for clients and their providers. The job description also states that staff supervisors are required to "take part in on call rotation with other supervisors."

At the time Kramer interviewed for the staff supervisor position, the on-call responsibilities were discussed with her. Balk told Kramer that if she was hired for the position, she would be placed on the on-call rotation after a 90-day probationary period. Kramer stated that handling the on-call responsibilities would be "no problem" because she had been working "24/7" at a Kwik Trip.[3]

During the time that a staff supervisor is on call, she can use her time for personal purposes and travel, so long as she remains within one-half hour of the 10-county area in which Homeward Bound operates. Workers on call are paid $20 a night throughout the work week and $2 an hour on weekends, which go from 4:30 p.m. on Friday to 8 a.m. on Monday. Although on-call shifts can sometimes be busy, a typical on-call shift requires taking infrequent phone calls to address rescheduling issues related to healthcare providers and patients. Every morning, Balk received an on-call report that showed the calls received and time spent on the call by the employees who were on call for that week.

---

[3] Although Kramer disputes that the on-call requirement was discussed during her interview, she fails to cite any admissible evidence that refutes Balk's testimony to the contrary.

3

Staff supervisors are scheduled to be on-call about five times a year.  Each December, Homeward Bound provides to its staff supervisors the call schedule for the entire following year. Any staff supervisor who cannot–or would rather not work–an assigned on-call shift is responsible for finding her own replacement for that shift.

Homeward Bound's employee handbook explains that 24-7 on-call services are necessary in order to serve Homeward Bound's customers "in the best, most efficient way possible."  The handbook specifically provides that:

- Homeward Bound requires on-call rotation as part of the job duties of Service Coordinators, Staff Supervisors, and Registered Nurses;

- Each staff member who is in the on-call rotation is responsible for the coverage during his/her assigned week. If a co-worker picks up the assigned staffer's on-call, then the assigned staffer must report this switch to the Service Coordinator in advance so the answering service can be alerted;

- "[T]he employee on-call needs to remain within one-half hour of the service area throughout their on-call week...";

- If an employee cannot meet this stay-near requirement during his/her on-call period, the employee must find a replacement who *is* within 30 minutes of the service area.

Homeward Bound's employee handbook also provides that "automatic termination will result after 3 unexcused absences in the course of employment."

Included on the handbook's list of conduct deemed to be "unacceptable" in the workplace is "(q) Failure to comply with authorized hours and/or assigned work schedule."

Homeward Bound hired Kramer as a staff supervisor on November 15, 2010.  Kramer was scheduled to work 40 hours a week, 8 a.m. to 4:30 p.m., Monday through Friday.

4

Homeward Bound's November 15, 2010 "welcome letter" to Kramer discussed job duties but did not mention the on-call requirement.  However, the letter did say that Kramer's duties included "any other duties that may be assigned by your supervisor" and that by signing the letter, Kramer was agreeing to abide by "all other requirements as listed in the employee handbook." [Aff. of Darla Kramer, dkt. 37, exh. 5.]   Kramer's first 90 days on the job were an orientation period during which Kramer was not required to take on-call.

On December 2, 2010, Kramer acknowledged having received the company's employee handbook, including the on-call policy.  (She received an updated handbook setting forth the same policy on April 11, 2011.)   In December 2010, Homeward Bound held an all-administrative staff training meeting that included a discussion of the policy manual.

Also in December 2010, Kramer and the other staff supervisors received their entire on-call schedule for the 2011 calendar year.  Terri Lips, a staff supervisor who preferred not to be on call, immediately sought and obtained replacements for her 2011 on-call shifts.

In February 2011, Kramer submitted a personal time off request for her on-call week of April 22-29, 2011; Kramer found replacements for her on-call shifts for the entire week.

Kramer was on-call the week of March 7 through March 15, 2011 and she performed her assigned duties without restrictions.  During this week, Kramer took phone calls for a total of approximately 64 minutes.

On or about March 26, 2011, Kramer reported to Homeward Bound that she had suffered a seizure.  A few days later, Kramer reported that she was not allowed to operate a motor vehicle due to a medical restriction; that same date, Homeward Bound received a letter from Kramer's doctor confirming that Kramer was unable to safely operate a motor vehicle,

which meant no driving for about three months.  Beginning April 1, 2011, Homeward Bound accommodated this restriction by arranging for other staff to drive Kramer to and from her clients or by paying her cab fare.

In May 2011, at Balk's request, Kramer traded her on-call week of May 17-23 for Balk's assigned week of May 9-16.  During this week, Kramer took phone calls for a total of about 99 minutes.

The week of June 6-13, 2011, Kramer covered the on-call shift of another employee who had asked for a replacement.  During this period, Kramer took phone calls for a total of about 228 minutes.

In June 2011, Kramer asked Balk if she could be scheduled for only 37.5 hours a week (7.5 hours a day) instead of 40, reporting that she was able to complete her work in that amount of time.  Homeward Bound granted plaintiff's request.  Starting June 20, 2011, Kramer's regular work schedule was changed to reflect that she worked only 37.5 hours a week (7.5 hours a day).

On or about June 30, 2011, Kramer's doctor provided her with a doctor's excuse that stated, "For medical reasons Darla should not take call."  On or about July 13, 2011, Homeward Bound's Human Resources Coordinator, Erin Jensen, contacted Kramer's doctor and asked her to clarify the June 30 note.  The doctor responded in a letter to Jensen, stating

> . . . For medical reasons, Darla should not be placed in a situation where sleep deprivation would be a possibility.  I would, therefore, request that, if she is required to take call, she have at least 8 hours of uninterrupted sleep.

Dec. of Balk, dkt. 29, exh. 9.

After receiving this letter, Balk and Schmitz approached Kramer and told her that they were reducing her on call hours to the period from 6 a.m. to 10 p.m., and that another employee would fill in for Kramer from 10 p.m. to 6 a.m. the next day.  This change would ensure that Kramer's on-call responsibilities would not prevent her from obtaining eight hours of uninterrupted sleep.  Kramer responded that she goes to bed before 10 p.m. and sleeps nine hours a night. Balk and Schmitz responded that if Kramer went to bed at 8:30 p.m., then she could be on call starting at 4:30 a.m., which would meet the eight-hour requirement prescribed by her doctor.  Balk and Schmitz told Kramer that she could choose which eight hours during the night she did not want to be on call.  Eventually, they agreed that Kramer's sleep time would be 10 p.m. to 6 a.m., during which some other employee would cover Kramer's call duties, although Kramer maintained her position that she needed nine uninterrupted hours, not eight.

On or about July 15, 2011, Homeward Bound received an updated letter from Kramer's doctor that stated:

> [Plaintiff] should be limited to no more than 40 hours of work per week.  When on call, she should have at least 8 hours of uninterrupted sleep occurring between 10 p.m. and 6 a.m.

Homeward Bound determined that it could work with these restrictions even if Kramer still was to take call.  Homeward Bound's plan was to use the daily on-call report and Kramer's self-reports of the time she spent on calls to monitor and to limit Kramer's total work hours each week; Balk would fill in for Kramer if it looked like Kramer was on course to exceed 40 hours in a week.  This plan ensured that Kramer did not exceed her medically-ordered limit, but Homeward Bound never had to implement it:  Kramer never worked on-call in the period after these accommodations were offered but before she was fired.

On July 20, 2011, Balk held a weekly meeting at which she confirmed that Kramer was scheduled to be on call the following week, from July 25-31.  Kramer told Balk that she was not going to work her on-call shifts.[4]  When Balk handed the computer to Kramer at 8 a.m. on July 25 for her to use during her on-call shift, Kramer refused to take it.  Unsure how to handle the situation, Balk contacted Jensen in HR to request a conference call with Kramer present.  Jensen told Balk and Kramer that if Kramer was not going to work her on-call shift that week, then Kramer was responsible for finding someone to cover for her.  Otherwise, Kramer would be written up for each day that she did not take call and did not have a replacement.  Jensen also told Balk and Kramer that if Kramer missed three on-call shifts with no replacement, then this would be cause for termination.

Kramer quickly began emailing co-workers.  She was able to find people to cover her on-call shifts for Monday, July 25 through Thursday, July 28; however, Kramer could not find coverage for the remainder of the week.  On July 29, Kramer announced to Balk that she was not going to work her on-call shifts on July 29-31, she did not have anyone to replace her and she had her car packed to leave town with her family after work that day.[5]

At about 4:15 p.m. on Friday, July 29, 2011, Balk provided plaintiff with a termination letter listing the grounds for termination as:

---

[4]  At her deposition, Kramer testified that she did this because her doctor "said no on-call, absolutely not."  Dep. of Darla Kramer, dkt. 28, at 108-109.  At the same time, however, Kramer admits that her doctor had provided a different set of restrictions to Homeward Bound and that Kramer was aware of these restrictions.  *See* PPFOF #s 35, 39.

[5]  In her proposed findings of fact, Kramer denies that she told Balk she was ready to go out of town with her family on July 29, 2011.  However, none of the evidence to which she cites refutes her deposition testimony, admitting that she said this.  *See* Plt.'s Response to Def.'s PPFOF, dkt. 35, ¶67 and Dep. of Darla Kramer, dkt. 28, at 89-90.

> Refusing to take on-call for Friday, Saturday and Sunday (3 missed shifts) which is one of your job duties and with-in your doctor's restrictions of having 8 hours of uninterrupted sleep. On Monday July 25 it was explained to you by Erin Jensen (HR) that for every day you didn't take on-call it would be treated as a missed shift. The policy states 3 unexcused in the course of employment will result in termination.

Balk and Kramer both signed the letter. To cover the remainder of Kramer's on-call week, Balk and Jensen cancelled their weekend plans and shared the on-call shift.

Balk would not have fired Kramer if Kramer had worked her on-call shift from July 29 through July 31 or had secured replacements for those days.

OPINION

## I. Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)). In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party. *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007). Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, she must come forward with enough evidence on each

of the elements of her claim to show that a reasonable jury could find in her favor. *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Conclusory allegations and self-serving affidavits, unsupported by the record, will not preclude summary judgment. *See Haywood v. North Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir.1997).

## II.  ADA Claims

Under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, as amended by the Americans with Disabilities Act Amendments of 2008 ("ADAAA"), it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . .  the hiring, advancement, or discharge of employees [.]"  42 U.S.C. § 12112(a).   In addition, the Act provides that an employer discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2001) (quoting 42 U.S.C. § 12112(b)(5)(A)). Thus, under the ADAAA, there are two distinct categories of disability discrimination claims: failure to accommodate and disparate treatment. *See Sieberns v. Wal–Mart Stores, Inc.*, 125 F.3d 1019, 1021–22 (7th Cir. 1997).  Both categories are at issue in this case.

### A.  Failure to Accommodate

In order to succeed on a failure to accommodate claim under the ADAAA, "a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). Homeward Bound contends that Kramer's claim fails on the third prong, namely, that she cannot show that Homeward Bound failed reasonably to accommodate her disability.[6]

"An employer satisfies its duty to reasonably accommodate an employee with a disability when the employer does what is necessary to allow the employee to work in reasonable comfort." *Hoppe v. Lewis University*, 692 F.3d 833, 840 (7th Cir. 2012) (citing *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995)). To determine the appropriate reasonable accommodation, the parties may need to engage in an "interactive process," consisting of a give-and-take between the employer and the employee to determine the extent of the employee's medical restrictions and the accommodations that might be available. *Id*.; 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation."). Both the employee and employer must engage in this process in good faith:

> An employer can take no solace in its failure to engage in this process in good faith if what results is an unreasonable or

---

[6] Kramer devotes a substantial portion of her brief to the ADAAA's more relaxed standards regarding whether someone has a disability. This is irrelevant because Homeward Bound has conceded for summary judgment purposes that Kramer is protected under the statute.

> inappropriate accommodation offer.  And an employee who fails to uphold her end of the bargain—for example, by not clarifying the extent of her medical restrictions—cannot impose liability on the employer for its failure to provide a reasonable accommodation.

*Hoppe*, 692 F.3d at 840 (internal citations and quotations omitted).

Here, the undisputed evidence establishes that Homeward Bound complied with its duty to engage in an interactive process with Kramer and that Homeward Bound reasonably accommodated Kramer's disability.  First, Homeward Bound accommodated Kramer's driving restriction by having others drive her to appointments and by paying cab fare.  Then, after receiving the vague doctor's note stating that Kramer should "not take call," Homeward Bound contacted Kramer's doctor for clarification.  In response, the doctor explained that Kramer should "not be placed in a situation where sleep deprivation would be a possibility." Therefore, if Kramer was required to take call, then she should be allowed to have eight hours of uninterrupted sleep.  Homeward Bound agreed to have other employees cover the on-call shift for Kramer during her eight hours of uninterrupted sleep time, and Homeward Bound allowed Kramer to choose which eight hours of the night would be uninterrupted.

Kramer insists this was not a reasonable accommodation because—as she told Homeward Bound—she sleeps nine hours a night, not eight.  However, an employer only is required to provide a qualified individual with a "reasonable accommodation, not the accommodation [the employee] would prefer."  *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000).  Further, the Court of Appeals for the Seventh Circuit has emphasized that "[t]he language of the ADA itself demonstrates that a reasonable accommodation is connected to what the *employer knows* about the *specific limitations* affecting an employee who is a qualified individual with a

disability." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 494 (7th Cir. 2014) (quoting *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005)) (emphasis in original).

Regardless what Kramer personally believed–and believes–that her restrictions *should have* been, Balk and Jensen reasonably understood the note from Kramer's doctor to state that Kramer could take call so long as she had eight hours of uninterrupted sleep a night and so long as her total hours worked in a week did not exceed 40. Nothing in this note indicated that Kramer needed more than eight hours of uninterrupted sleep a night to prevent a seizure, and Kramer does not produce any evidence, such as a note or affidavit from her doctor, to substantiate her proclamation that she does. Moreover, Kramer does not say why her epilepsy prevented her from finding her own replacements for her on-call shifts in the event she did not wish to work them, as she was permitted to do under Homeward Bound's policies. Although Kramer was unable to find replacements for the weekend of July 29, the evidence shows that this had nothing to do with Kramer's disability and everything to do with her failure to start looking for replacements sooner.

Kramer contends that Homeward Bound should have eliminated her on-call responsibilities entirely by assigning them to different employees, arguing that the on-call requirement was a marginal, non-essential duty of her position. In presenting this argument Kramer appears to recognize that the ADA does not require an employer to reallocate "essential" functions of a job in order to accommodate an employee's disability. *See Basith v. Cook County*, 241 F.3d 919, 932 (7th Cir. 2001) (employer not required to reallocate essential functions of a job). But Kramer has not presented evidence sufficient to cause this court to second guess Homeward Bound's decision that on-call *was* an essential function of the staff supervisor

position.  *See Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines what functions are essential, and we will not second-guess that decision.").

The ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).  Other factors the court may consider are the work experience of past incumbents of the job, the work experience of current incumbents in similar jobs and the amount of time on the job performing the function. *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 964 (7th Cir. 2014) (quoting *Basith*, 241 F.3d at 927).  Here, there is abundant support for Homeward Bound's contention that on-call duties were an essential function of Kramer's job, including:

- the written job description for a staff supervisor specifically lists on-call duties as part of the job requirement;

- the on-call duties are discussed at length in the employee handbook, which explains that on-call coverage is necessary to ensure Homeward Bound's customers receive 24-7 service;

- staff supervisors are given their assigned five weeks of on-call hours a year in advance and are clearly informed that if they cannot work their assigned shift, it is their responsibility to secure a replacement;

- there is no evidence of any other Homeward Bound employee besides Kramer who did not work her scheduled on-call shift without securing a replacement;

- when Kramer failed to secure a replacement for her on-call shifts, Jensen and Balk cancelled their plans so they could cover them.

Kramer has little more than a scintilla of countervailing evidence. She points out that on-call duties were not mentioned in her November 15, 2010 welcome letter, but it is undisputed that these duties were discussed during Kramer's interview with Balk. In any case, the fact that Homeward Bound did not mention Kramer's on-call duties in a single letter does not overcome the deference owed to Homeward Bound's judgment—amply supported by the written job description and other evidence in the record—that on-call rotation was an essential job duty. Kramer also points to the fact that another employee (Lips) did not take call, but it is undisputed that this was only because Lips promptly found her own replacements, not because Homeward Bound excused her from the rotation or deemed on-call duties to non-essential. Finally, the other evidence cited in Kramer's brief, dkt. 36, at 13, such as the "Staff Supervisor's Weekly Assignments," is not cited in support of any proposed fact and therefore must be disregarded.

In any event, the discussion whether Homeward Bound could or should have reallocated Kramer's on-call duties entirely is largely beside the point. By limiting her on-call hours in accordance with the note from her doctor, Homeward Bound complied with its duty to reasonably accommodate Kramer's disability. Accordingly, it had no duty to provide a different accommodation. *Accord Basith*, 241 F.3d at 932 ("[S]ince the clean air room assignment accommodated Basith's disability, Cook County was under no duty to provide a different accommodation, such as the proposed wheelchair.").

In sum, the evidence adduced on summary judgment shows that Homeward Bound did what was necessary to allow Kramer to work "in reasonable comfort." Homeward Bound was

not legally required to acquiesce to Kramer's demand that it should have completely relieved her from her on-call responsibilities.

## B.  Discrimination

To prevail on a claim unlawful discharge under the ADAAA, a plaintiff must show that her employer would not have fired her but for her actual or perceived disability; proof of mixed motives will not suffice. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010).[7] "The phrase 'but for' is another way of saying that a particular reason is a 'necessary condition' of an event." *Hudson v. Lands' End Inc.*, 928 F. Supp. 2d 1045, 1054 (W.D. Wis. 2013) (quoting *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011)).  The relevant question is "whether the same events would have transpired if the employee had [not been disabled] and everything else had been the same." *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994).

When it comes to summary judgment, there are two ways of proving a discrimination claim under the Act:  the "direct" method and the "indirect" method.  *Dickerson v. Bd. of Trustees*

---

[7] *Serwatka* was decided based on pre–2008 ADA language stating that employers could not discriminate "because of" a disability.  Kramer's lawsuit is controlled by the 2008 amendments (effective as of January 1, 2009), which state that employers may not discriminate "on the basis of" a disability.

In *Serwatka*, 591 F.3d at 961–62 n. 1, the court acknowledged the new language but declined to rule on whether it would have any effect on this "no mixed-motive" rule; it has not spoken on this issue since. Other courts that have considered this question have continued to apply the rule announced in *Serwatka*, noting the lack of any significant difference between the terms "on the basis of" and "because of." *See, e.g.*, *Walters v. Mayo Clinic Health Sys.-EAU Claire Hosp., Inc.*, 998 F. Supp. 2d 750, 767 (W.D. Wis. 2014) (Conley, J.); *Selan v. Valley View Cmty. Unit Sch. Dist. 365-U*, No. 10 CV 7223, 2013 WL 146415, at *8 n.9 (N.D. Ill. Jan. 14, 2013); *Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.*, No. 1:12-CV-0817-RLY-MJD, 2013 WL 121838, at *4 (S.D. Ind. Jan. 9, 2013). Applying this same reasoning, and absent further guidance from the Seventh Circuit, I follow suit.

*of Comm'y College Dist. No. 522*, 657 F.3d 595, 601 (7ᵗʰ Cir. 2011).  Kramer is proceeding under the indirect method ( Br. in Opp., dkt. 36, at 9) which requires her first to establish a *prima facie* case of discrimination by showing that: (1) she is disabled under the ADAAA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably.  *Taylor-Novotny*, 772 F.3d at 489; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (establishing standard under Title VII of Civil Rights Act).  If Kramer establishes a *prima facie* case, then the burden shifts to Homeward Bound to identify a legitimate, non-discriminatory reason for its employment decision.  *Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7ᵗʰ Cir. 2005).  If Homeward Bound meets its burden, then Kramer must prove by a preponderance of the evidence that these reasons are pretextual.  *Lloyd*, 552 F.3d at 601.

Before examining Kramer's evidence, I must address her suggestion that, after enactment of the Amendments to the ADA, a plaintiff proceeding under the indirect method of proof no longer is required to put forth evidence of similarly situated non-disabled employees who were treated more favorably.  Kramer's suggestion is incorrect.  The only case Kramer cites for this proposition is *Hoppe*, 692 F.3d at 839.  Nothing in *Hoppe* indicates that the court jettisoned any of the *McDonnell Douglas* elements; most of the court's discussion focuses on whether the University offered the plaintiff a reasonable accommodation for her disability.  *Id*. at 839-841. Further, the court affirmed *McDonnell Douglas*'s vitality when it discussed the plaintiff's retaliation claim, explaining that because she had "neither alleged nor provided evidence of any similarly situated employees not subjected to the same adverse action . . .  she may only proceed under the direct method of proof."  *Id*. at 841.  Finally, as Homeward Bound points out, the

17

Court of Appeals for the Seventh Circuit has maintained the similarly situated requirement as part of the plaintiff's *prima facie* burden in several post-ADAAA cases. *See, e.g., Taylor-Novotny*, 772 F.3d at 489; *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 686 (7th Cir. 2014); *Chloe v. City of Indianapolis*, 712 F.3d 1171, 1182 (7th Cir. 2013). For all of these reasons, I reject Kramer's suggestion that she may proceed under the indirect method in the absence of evidence of a similarly situated non-disabled employee who was treated more favorably than she was.

Kramer has no such evidence. Insofar as Kramer attempts to compare herself to Lips, the comparison fails. Although Lips did not work any on-call shifts during the time Kramer worked for Homeward Bound and was not fired, it is undisputed that Lips had secured replacements for every one of her assigned on-call shifts well in advance. The Court of Appeals for the Seventh Circuit has "cautioned that, in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings." *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (internal quotation marks omitted). Lips never refused to work an on-call shift without securing a replacement. Therefore, Lips is not a proper comparator. Without a comparator, Kramer's case is over. *Accord Bunn*, 753 F.3d at 685 ("It is Bunn's responsibility to identify a satisfactory comparator to the court, and he has not done so. When an employee cannot make out a *prima facie* case, that is the end of it; summary judgment is warranted.").

For completeness's sake, I note that even if Kramer could establish a *prima facie* case, Homeward Bound has met its burden of producing a legitimate reason for Kramer's termination: her refusal to work three consecutive on-call shifts or find a replacement. The burden thus shifts back to Kramer to establish by a preponderance that Homeward Bound's stated reason is a

pretext for discrimination. Pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F .3d 633, 642 (7th Cir. 2008)). Pretext can be shown by identifying weaknesses, implausibilities, inconsistencies, or contradictions in an employer's asserted reason for taking an adverse employment action such that a reasonable person could find it unworthy of credence. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 852–53 (7th Cir. 2012)).

Kramer has not pointed to any evidence that would call into question the honesty of Homeward Bound's reason for terminating her. She attempts to manufacture a contradiction by arguing that it was specious for the company to fire her for missing three straight "shifts" when the company does not even consider an employee who is on call to be "working," at least insofar as the Fair Labor Standards Act is concerned. *See* Plt.'s Br. in Opp., dkt. 36 at 17 (citing *Dinges v. Sacred Heart St. Mary's Hosp., Inc.*, 164 F.3d 1056, 1057 (7th Cir. 1999) (determining whether employee "on call" was at "work" and therefore entitled to overtime pay under FLSA by evaluating what activities employee could do during on-call periods)). This is a clever semantic argument, but it does not get Kramer very far. The fact that Homeward Bound determined that its on-call employees were not "working" as defined by the FLSA has no bearing on whether Homeward Bound genuinely believed that an essential part of Kramer's job duties was to perform her on-call duties, and that Kramer's failure to work or obtain coverage for three consecutive on-call shifts constituted grounds to fire her.

Kramer also points out that Balk fired her for missing three shifts before the shifts had actually been missed. According to Kramer, this explanation is "bizarre" enough to permit an

19

inference of discrimination.  In some situations, a premature termination might permit an inference of pretext, but this is not one of those situations.  Kramer admits that she had been warned on July 25 that if she missed three on-call shifts without securing a replacement, then she would be in violation of Homeward Bound's absentee policy and at risk of termination; she admits that she told Balk on July 29 that she was not going to work her on-call shifts over the weekend and that she had not found replacements for those shifts; and she admits that she told Balk she was going out of town with her family for the weekend.  Moreover, Kramer does not now suggest that she had any intention of working those shifts.  Quite to the contrary, Kramer asserts that she had the right to refuse to do on-call work–and apparently, the right to refuse to obtain coverage--because she was, in her view, medically excused from her on-call duties.  In light of Kramer's unequivocal refusal to work her assigned on-call shifts, Balk's decision to terminate Kramer at the time of her refusal is neither bizarre nor suspicious.

In the end, Kramer's case boils down to a reasonable accommodation case: was Kramer justified in refusing to work her on-call shifts under the accommodations proposed by her employer?  Kramer has failed to adduce evidence to show that the schedule modifications offered by Homeward Bound–coupled with Kramer's right to obtain substitutes for every one of her on-call shifts--were insufficient to accommodate the specific medical limitations specified by her doctor because of her epilepsy.  Therefore, the only reasonable conclusion a jury could reach is "No."  This being so, and in the absence of any evidence that Homeward Bound chose not to fire a non-disabled employee for refusing to work three consecutive on-call shifts, and in the absence of any other evidence to support an inference of discrimination, Kramer is left without a basis for her claim that she was fired on the basis of her disability.

ORDER

Defendant Homeward Bound, Inc.'s motion for summary judgment, dkt. 25, is GRANTED.

The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 21st day of July, 2015.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

21